UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:21-cr-10118-IT |
| | * | |
| JOSE LARIOS, et al., | * | |
| | * | |
| Defendants. | * | |

<u>MEMORANDUM & ORDER</u>

February 2, 2023

TALWANI, D.J.

On April 15, 2021, a grand jury indicted Defendants Jose Larios, Angel Valenzuela, Rafael Torres, and two others. Indictment [Doc. No. 1]. Larios, Torres, and Valenzuela were charged with conspiracy to distribute and to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846 and Larios and Torres were charged with conspiracy to launder money in violation of 18 U.S.C. § 1956(h). <u>Id.</u> Larios, joined by Torres, now seeks to suppress evidence the government obtained pursuant to wiretap interceptions under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, <u>see</u> 18 U.S.C. §§ 2510-2522, and any evidence derived therefrom. Mot. to Suppress Title III Interceptions [Doc. No. 114]; Elec. Order [Doc. No. 152] (permitting Torres to join Larios's motion). Valenzuela seeks to suppress evidence the government obtained from a vehicle search. Mot. to Suppress Evidence [Doc. No. 115]. For the following reasons, the motions are DENIED.

I. **Background**

A. *The Start of the Investigation*

In October 2019, the Drug Enforcement Administration ("DEA") began an investigation into a Mexico-based drug trafficking organization (the "DTO") based on information obtained

from a confidential source ("CS-1") and a DEA cooperating witness ("CW-1"). DEA Agent

Mark Concannon, Jan. 6, 2020 Affidavit ("Concannon Aff.") ¶¶ 25, 28 [Doc. No. 114-4]. CS-1

provided information that the DTO could supply multiple-kilogram quantities of fentanyl to

buyers in the United States. Id. at ¶ 28. CS-1 passed the phone number of CW-1 to a Mexican

male, Alejandro Cisneros Noyola (aka "Capi"), and CW-1 engaged in negotiations with several

members of the DTO to arrange the transport of 17 kilograms of fentanyl to Massachusetts. Id. at

¶¶ 7, 23, 29.

During the week of October 14, 2019, CW-1 received several calls from various Mexico-

based numbers and discussed the buying and selling of kilogram quantities of fentanyl. Id. at

¶¶ 30-32.[1] The first call was from an unknown Mexican male who discussed establishing a drug

trafficking relationship with CW-1 and inquired about which drugs CW-1 was interested in

purchasing. Id. at ¶ 30. CW-1 said that he was interested in purchasing fentanyl. Id. The Mexican

male told CW-1 that he had an associate who could arrange to sell CW-1 kilogram quantities of

fentanyl. Id. at ¶ 31.

CW-1 received a second call from a different Mexico-based number in which he spoke

with a different Mexican male. Id. at ¶ 32. The second caller told CW-1 that he could pick up 10

kilograms of fentanyl in New York, to which CW-1 responded that he was in Massachusetts and

would not travel to New York to pick up the fentanyl. Id. The second caller informed CW-1 that

he would find someone to transport the drugs to CW-1 in Massachusetts and he further agreed to

sell CW-1 fifteen kilograms of fentanyl at a price of $44,000 per kilogram, inclusive of

---

[1] All referenced calls between CW-1 and other callers were consensually recorded on the phone
used by CW-1. Concannon Aff. ¶ 30 [Doc. No. 114-4]. An application on CW-1's cellular phone
also recorded texts placed to or from the cellular phone. Id. at ¶ 30 n.2. Investigators confirmed
the contacts through toll records. Id.

transportation costs. Id. He also let CW-1 know that "the guy" would call CW-1 when he was near the agreed upon meeting location in Boston, Massachusetts. Id.

Over the next two weeks, CW-1 had conversations with various men calling from Mexican-based phone numbers to coordinate the drug transaction, including a man named Alejandro. Id. at ¶¶ 32-39. On October 25, 2019, CW-1 exchanged a series of recorded calls and text messages with a Mexico-based cellular phone number during which a male who identified himself as Alejandro continued to discuss the logistics of the drug transaction with CW-1. Id. at ¶ 34.

B.    *Communications between CW-1 and the "1085 Phone" Regarding Delivery*

On October 26, 2019, CW-1 received a text message from the phone number (857) 261-1085 (the "1085 Phone"),[2] which read, "Man on behalf of the Capitan."[3] Id. at ¶¶ 17a, 37; DEA Agent Mark Drobac Jr., July 1, 2020 Affidavit ("Drobac Aff.") ¶ 27 [Doc. No. 114-9]. That same day, the 1085 Phone was used to call CW-1 and the caller said he was calling "on behalf of the Capitan." Concannon Aff. ¶ 38 [Doc. No 114-4]. CW-1 asked what was going on, and the 1085 Phone caller replied, "I need the address." Id. CW-1 told the 1085 Phone caller that he could not go that day. Id. The 1085 Phone caller replied, "Ok, so this week coming up?" Id. CW-1 agreed, confirming that they would meet the following week to conduct the drug transaction. Id. The call ended with CW-1 and the 1085 Phone caller agreeing to speak later. Id.

---

[2] As discussed below, on January 2, 2020, the 1085 Phone was found in Valenzuela's possession at the time of his arrest.

[3] Agent Concannon stated that he believes the 1085 Phone texter was explaining that he was contacting CW-1 on behalf of Capi to coordinate the fentanyl purchase that CW-1 and Capi had previously discussed. Id. at ¶ 37.

C.     *October 30, 2019 Communications with CW-1*

On October 30, 2019, CW-1 received a call from another unidentified Mexican male who told CW-1 he was flying out to meet with CW-1 the following day. Id. at ¶ 39. After this call, CW-1 spoke with Alejandro, who told CW-1 that "his guys" would be arriving in Boston the following day to meet with CW-1 to finalize the logistics for the delivery of the fentanyl. Id. During the call, CW-1 provided Alejandro with an address for a location in Boston and a time for when the meeting would take place. Id.

D.     *Larios's October 31 and November 2, 2019 Meetings with CW-1*

On October 31, 2019, Larios rented a car from the Enterprise car rental office, located at the Bradley International Airport in Windsor Locks, Connecticut. Id. at ¶ 40. Enterprise records show that in renting the vehicle, Larios gave his California driver's license and the telephone number the government later identified as the Target Telephone in the January 6, 2020 wiretap application. Id. at ¶¶ 7a, 40. The same day, investigators observed Larios and Oscar Velazquez Alonso ("Velazquez") inside the rental car in the parking lot of the meeting location that CW-1 had provided to Alejandro for finalizing logistics of the drug transaction. Id. at ¶¶ 17b, 17d, 39-41. CW-1 called Alejandro when he arrived at the location, and Alejandro directed CW-1 to Larios. Id. at ¶ 41.[4] Larios entered CW-1's vehicle and told CW-1 that a courier who worked for Larios would deliver 17 kilograms of fentanyl to CW-1 the following day. Id. at ¶ 41.[5]

On November 1, 2019, Alejandro called CW-1 and told him that the delivery truck had been delayed and that Larios would call CW-1 later that afternoon to arrange a meeting where

---

[4] Investigators later matched the person they saw in the car at the location with the photograph on the driver's license Larios provided to Enterprise. Id. at ¶ 40.

[5] The meeting inside CW-1's car was recorded. Id. at ¶ 41.

they could discuss the delivery. Id. at ¶ 42. On November 2, 2019, after CW-1 spoke with
Alejandro on the phone again, investigators surveilled CW-1 meeting with Larios and Velazquez
in Boston. Id. at ¶ 43. At that meeting, Larios told CW-1 that the delivery truck was in Assonet,
Massachusetts, and that someone would call CW-1 the next morning to finalize details of the
transfer. Id. Also during this meeting, CW-1 observed that Velazquez was in possession "of
numerous cell phones," and when Larios said he was going to call the courier Velazquez selected
a specific phone from "the bunch" to hand to Larios. Id.

     E.     *November 3, 2019 Drug Transaction*

On November 3, 2019, Larios texted CW-1—from a phone other than the Target
Telephone—the address in Assonet where CW-1 was to meet the courier. Id. at ¶ 44. As CW-1
approached the white tractor trailer truck, driven by Defendant Marco Antonio Jauregui
("Jauregui"), Jauregui gave CW-1 a "thumbs up signal" and handed him a bag that weighed
approximately 17 kilograms and contained "17 individually heat sealed brick shaped packages,"
the contents of which field-tested positive for fentanyl. Id.[6]

Once CW-1 had taken possession of the fentanyl, investigators directed Massachusetts
State troopers to stop Larios's rental car as it was driving towards Connecticut. Id. at ¶ 45.
During the stop, the officer identified Larios and Velazquez by their California driver's licenses.
Id.

---

[6] The suspected fentanyl was sent to the DEA Laboratory for confirmation testing, and those
results were pending at the time the Concannon Affidavit [Doc. No. 114-4] was signed. Id. at
¶ 44.

F.     *Communications After the November 3, 2019 Drug Transaction*

After the November 3, 2019 delivery, Alejandro called CW-1 numerous times to collect payment for the drugs. Id. at ¶ 50. On December 22, 2019, Alejandro gave CW-1 a phone number (not the Target Telephone number) to contact Larios. Id. On December 23, 2019, CW-1 called Larios at that number and Larios pressed CW-1 for "the balance" and what was "pending." Id. at ¶ 51. Agent Concannon states in his affidavit that he believes based on the investigation that Larios was referring to payment for the 17 kilograms of fentanyl. Id. at ¶ 52.

G.     *January 2, 2020 Drug Transaction and Vehicle Stop and Search*

On January 1, 2020, the precise location data for Jauregui's phone indicated it was in the District of Massachusetts. Id. at ¶ 53.[7] The following day, the precise location data for the 1085 Phone indicated it was in the vicinity of 797 River Street, Hyde Park, Massachusetts ("797 River Street"). Id. at ¶ 54. The location data had allowed investigators to identify 797 River Street as a "drug stash location." Id. at ¶ 79.

Using the precise data location, agents followed the 1085 Phone as it traveled away from 797 River Street in a white Honda Accord and led them to a truck driven by Jauregui. Id. at ¶ 54; Drobac Aff. ¶ 51 [Doc. No. 114-9].[8] Agents observed Jauregui and Valenzuela meet at the passenger-side of Jauregui's truck and observed Valenzuela unload two heavy black duffle bags

---

[7] On October 29 and December 20, 2019, a magistrate judge issued warrants authorizing agents to obtain precise location data for the 1085 Phone and the phone used by Jauregui (as well as another phone believed to be connected with the DTO). Drobac Aff. ¶¶ 121, 134-135 [Doc. No. 114-9].

[8] The government contends that this truck was the same as the one that investigators observed Jauregui use in the November 3, 2019 drug transaction. The Drobac Affidavit [Doc. No. 114-9] identifies different license plate numbers for the truck (varied by one number), different states (but the same plate number) for the tractor license plate, and different manufacturing years for the tractor. See Drobac Aff. ¶¶ 36, 50 [Doc. No. 114-9]. Valenzuela does not raise these discrepancies in his motion, and the court finds that they are not material to the issue at hand.

and place them in the white Honda Accord. Concannon Aff. ¶ 54 [Doc. No. 114-4]; Drobac Aff.

¶ 51 [Doc. No. 114-9]. Agents followed the white Honda Accord. Concannon Aff. ¶ 54 [Doc. No

114-4]; Drobac Aff. ¶ 51 [Doc. No. 114-9]. The Honda Accord stopped in Woburn,

Massachusetts where the agents saw Valenzuela exit the vehicle and get into a Chevy Equinox.

Drobac Aff. ¶ 51 [Doc. No. 114-9].

Agents requested that the Chevy Equinox be stopped and at approximately 12:20 p.m. on

January 2, 2020, a Massachusetts State Police trooper pulled over the vehicle. Concannon Aff.

¶ 54 [Doc. No 114-4]. The driver of the Chevy Equinox told agents that he was an Uber driver

and that the destination Valenzuela had given when he ordered the Uber was 797 River Street.

Drobac Aff. ¶ 51. [Doc. No. 114-9].[9]

When the vehicle was stopped, Valenzuela was in the back seat and the two black duffel

bags were in the car within his reach. Id. Authorities seized the duffle bags and discovered

therein twenty-three "individually wrapped bricks of a substance, which field tested positive for

cocaine." Concannon Aff. ¶ 55 [Doc. No. 114-4]. Valenzuela claimed that he had no knowledge

of the cocaine, that someone had paid him $900 to pick up the bags, and that his friend lived at

the 797 River Street address. Id. at ¶ 55. Valenzuela was placed under arrest. Id. At the time of

arrest he had the 1085 Phone in his possession. Id.

---

[9] The government states that at the time of the stop there was an outstanding warrant for
Valenzuela's arrest for failure to appear in Massachusetts District Court related to charges of
forgery, possession of falsified documents, and a false application for a license, and an
outstanding warrant for cocaine trafficking. Opp'n 5 n.3 [Doc. No. 136].

H.      *Toll Records and DEA Agent Concannon's Analysis of the Target Telephone's Communications*

According to toll records, between October 3, 2019, and January 2, 2020, there were 42 calls between the Target Telephone and a phone believed to be used by Jauregui. Id. at ¶ 58. Toll records show that "minutes prior" to the October 31, 2019 meeting between CW-1 and Larios, "the Target Telephone had contact with (909) 320-0416," which investigators later identified as the phone number used by Jauregui. Id. at ¶¶ 29, 58.[10] Agent Concannon states that he believes Larios "used the Target Telephone to call [Jauregui] prior to the meeting so Larios could obtain information about [Jauregui's] whereabouts so he could in turn inform CW-1 when the fentanyl would be arriving in Massachusetts." Id. at ¶ 58. On January 2, 2020, the Target Telephone had "two contact[s] with [Jauregui's] phone prior to the delivery of the 23 kilograms of cocaine to" Valenzuela. Id. Agent Concannon states that he "believe[s] [Larios] used the Target Telephone to coordinate that delivery." Id.

Between October 3, 2019, and January 2, 2020, toll records show 196 calls and 32 text messages, with the most recent contact on December 28, 2019, between the Target Telephone and a phone number subscribed to a certain individual who was arrested by the DEA in 2008 and at the time of arrest was "transporting one pound of methamphetamine while armed with a loaded 9mm semi-automatic handgun." Id. at ¶ 59.[11] Agent Concannon states that this individual is believed to be a "criminal associate of Larios." Id.

_____

[10] On November 6, 2019, investigators contacted Mercer Transportation Company Inc., the trucking company for which Jauregui works, and it provided (909) 320-0416 as Jauregui's contact number. Concannon Aff. ¶ 58 [Doc. No. 114-4].

[11] The individual's name is redacted in the affidavit. Id. at ¶ 59.

Toll records also show that between October 3, 2019, and January 2, 2020, there were 4 calls and 30 text messages between the Target Telephone and a phone number subscribed to JDS Transport, a trucking company for which Larios is a financially liable party. Id. at ¶ 60. Agent Concannon states that based on the facts detailed above, Larios is "known to use truck drivers to distribute multi-kilograms of fentanyl to customers in the United States." Id.

I.      The Wiretap Interceptions

On January 6, 2020, the government applied for authorization to tap the Target Telephone, see Appl. ¶ 2.a [Doc. No. 114-3], relying on an affidavit submitted by Agent Concannon, see Concannon Aff. [Doc. No. 114-4].

The Concannon affidavit identifies the objectives of this investigation as including:

a.   The identities and locations of accomplices, aiders and abettors, co-conspirators and participants in the Target Offenses,[12] in particular those persons storing, transporting, and distributing narcotics;

b.   The locations and items used in furtherance of the Target Offenses, in particular, the locations where controlled substances are stored in the United States, and the locations where controlled substances are distributed in the United States;

c.   The existence and locations of records pertaining to the Target Offenses;

d.   The locations and sources of resources used to finance the Target Offenses;

e.   The locations and disposition of the proceeds from the Target Offenses;

---

[12] The Target Offenses include "offenses enumerated in 18 U.S.C. § 2516, namely possession and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(l); the use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b)(3); conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957." Id. at ¶ 7.

      f.   The times and dates when the persons involved in this narcotics operation

         transport, deliver and pick up narcotics; and

      g.   The methods, times, and places of interstate or foreign travel and transportation in

         aid of the Target Offenses.

Id. at ¶ 62. Agent Concannon concludes that intercepting the Target Telephone "will assist in

identifying the nature and extent of [Larios's] criminal activities, their relationships with the

other Target Subjects, and the identification of other co-conspirators who are not currently

identified." Id. at ¶ 107.

      On January 6, 2020, a district judge in this District granted the wiretap application and

authorized the DEA to intercept communications made to and from the Target Telephone. See

First Order Authorizing Interception of Wire Communications ("First Order") [Doc No. 114-5].

The same district judge issued a second 30-day authorization order on February 6, 2020, see

Second Order Authorizing Interception of Wire Communications ("Second Order") [Doc. No.

114-8],[13] and a district judge in the Central District of California issued three additional 30-day

authorizations to intercept the Target Telephone on July 1, 2020, August 18, 2020, and February

8, 2021, see Third Order Authorizing Interception of Wire Communications [Doc. No. 114-10];

Fourth Order Authorizing Interception of Wire Communications  [Doc. No. 114-12]; Fifth Order

Authorizing Interception of Wire Communications  [Doc. No. 114-14].[14]

---

[13] The second wiretap application was accompanied by a second affidavit by Agent
Concannon—dated February 6, 2020—which referenced his January 6, 2020 affidavit and added
additional information obtained from the ongoing investigation as well as communications
intercepted from the Target Telephone pursuant to the First Order. See Agent Mark Concannon,
February 6, 2020 Aff. [Doc. No. 114-7].

[14] The third, fourth, and fifth wiretap applications were each accompanied by an affidavit by
Agent Mark Drobac incorporating the contents of all prior affidavits. See Mark Drobac, July 1,
2020, August 18, 2020, and February 8, 2021 Affs. [Doc. Nos. 114-9, 114-11, 111-13].

During the DEA's monitoring of the Target Telephone pursuant to these authorizations, conversations involving Larios and other members of the DTO were intercepted and recorded.

## II.     Valenzuela's **Motion to Suppress**

### A.     *Statement of Law*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant are "per se unreasonable under the Fourth Amendment . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). If a warrantless search does not fall within an exception, evidence seized during that search may not be used against the defendant, Wong Sun v. United States, 371 U.S. 471, 488 (1963), and instead is suppressed "to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236--d 37 (2011).

One such exception—the automobile exception—provides that a law enforcement officer may perform a warrantless search of a vehicle so long as the officer has probable cause to believe that the vehicle contains contraband. See United States v. White, 804 F.3d 132, 136 (1st Cir. 2015). Where law enforcement has probable cause to search a container in a car, the automobile exception also allows the search of that container without first obtaining a warrant. See California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

"Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the

belief that evidence of a crime will be found.'" United States v. Dion, 859 F.3d 114, 131-32 (1st Cir. 2017) (quoting United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014)). "Importantly, [t]he test for probable cause is not reducible to precise definition or quantification, but rather [t]he standard is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place." Id. at 132 (internal quotation marks and citations omitted) (omission and alteration in original); see also United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017) ("Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts"). "And that means all that is required is the kind of 'fair probability on which reasonable and prudent people, not legal technicians, act.'" Dion, 859 F.3d at 131-32 (quoting Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." Id. (quoting Harris, 133 S. Ct. at 1055) (omission and alteration in original).

"[W]hen reviewing the existence of probable case . . . [the court] look[s] to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." Azor, 881 F.3d at 8.

B.    Discussion

Valenzuela moves to suppress all evidence, including the narcotics, recovered as a result of the January 2, 2020 vehicle stop and search on grounds that the search was not supported by probable cause in violation of the Fourth Amendment. Mot. to Suppress [Doc. No. 115]. Specifically, Valenzuela contends that the January 2, 2020 interaction between him and Jauregui observed by law enforcement, without more information, cannot support a finding of probable

cause to stop and search the Chevy Equinox or the duffel bags contained inside. Mem. in Supp. 4-5 [Doc. No. 116].

The government counters that DEA investigators had additional information to support their belief that Jauregui had just delivered drugs to Valenzuela when they requested the state trooper to stop the Chevy Equinox in which Valenzuela was traveling. Opp'n 8 [Doc. No. 136]. The government points to the following information known to DEA investigators at the time of the stop: (i) on October 26, 2019, the 1085 Phone communicated with CW-1 to coordinate details for the delivery of the 17 kilograms of fentanyl, (ii) Jauregui acted as a drug courier, as evidenced by his delivery of the 17 kilograms of fentanyl to CW-1 on November 3, 2019; (iii) on January 2, 2020, Valenzuela was in possession of the 1085 Phone, for which the government had precise data location; and (iv) on January 2, 2020, Valenzuela and Jauregui met briefly and transported two duffel bags that appeared heavy from Jauregui's truck to Valenzuela's car similar to the November 3, 2019 drug delivery. See Concannon Aff. ¶¶ 37-38, 44-45, 53-55 [Doc. No. 114-4]; Opp'n 8-9 [Doc. No. 136].

At the time of the challenged search, the DEA investigators' suspicions of criminal activity were thus based on far more than "guilt by association" with Jauregui as Valenzuela characterizes it. Mem. in Supp. 5 [Doc. No. 116]. Based on the evidence collectively known to law enforcement at the time of the January 2, 2020 vehicle search, the court finds that law enforcement had probable cause to believe there were drugs inside the duffel bags.[15]

---

[15] Where probable cause existed for the search of the duffel bags, the court need not determine whether the bags were in the backseat with Valenzuela, see Concannon Aff. ¶¶ 54-55 [Doc. No. 114-4]; Drobac Aff. ¶¶ 51-52 [Doc. No. 144-9], or in the trunk, see Mem. in Supp. 3-5 [Doc. No. 116]; unsigned Valenzuela Affidavit [Doc. No. 115-1], or whether the duffle bags were zipped and closed, see unsigned Valenzuela Affidavit [115-1]; Mem. in Support 1 [Doc. No. 116], or one of the bags was partially open, see Opp'n 5 [Doc. No. 136].

Valenzuela's argument that no probable cause exists where there was no "investigation or information gleaned after the stop . . . [that] provid[ed] the officers and agents with probable cause to believe that narcotics were in the duffel bag" misses the mark. Id. at 5. "[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to [conduct a search] we 'impute' to the [latter] officer the directing officer's knowledge." United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). Investigators' knowledge of Valenzuela's involvement with the DTO, his possession of the 1085 Phone used in coordinating a drug delivery, and his January 2, 2020 interaction with Jauregui were therefore imputed to the state trooper who conducted the stop. Where probable cause existed for the search of the Chevy Equinox and the two duffel bags prior to the stop, no further investigation or information after the stop was necessary to substantiate the search.[16]

Accordingly, the court finds no Fourth Amendment violation occurred where law enforcement had sufficient probable cause to conduct the search of the Chevy Equinox and the two duffel bags inside.[17]

_____

[16] Valenzuela also requests an evidentiary hearing to dispute the knowledge of the police at the time of the search and their claimed observations. Mot. to Suppress 1 [Doc. No. 115]. However, "[a] criminal defendant has no presumptive right to an evidentiary hearing on a motion to suppress." United States v. Cintron, 724 F.3d 32, 36 (1st Cir. 2013). "Rather, '[a] hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief.'" Id. (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)). The court finds that an evidentiary hearing is not necessary where, absent a general contention that the law enforcement officers did not have probable cause for the search, Valenzuela does not dispute any of the information known to law enforcement collectively and there was probable cause to search the duffel bags in the Chevy Equinox based on that information.

[17] As sufficient probable cause existed to conduct the search, the court need not address the government's alternative argument that the evidence at issue is admissible pursuant to the inevitable discovery doctrine where both Valenzuela and the driver of the car had outstanding

### III.     Larios's **Motion to Suppress**

*A.     Statement of Law*

Title III, "authorize[s] wiretapping as needed to allow effective investigation of criminal activities while at the same time ensuring meaningful judicial supervision and requiring specific procedures to safeguard privacy rights." United States v. Gordon, 871 F.3d 35, 42 (1st Cir. 2017); see also United States v. Lopez, 300 F.3d 46, 51 (1st Cir. 2002) ("In accordance with Congress's concern for preserving privacy, Title III makes the interception of electronic communications by law enforcement an extraordinary investigative technique whose use is to be distinctly the exception—not the rule." (internal quotations omitted)). Under Title III, an issuing judge must find not only that a wiretap application demonstrates "there is probable cause for belief that an individual is committing, has committed, or is about to commit" a criminal offense and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception," but also that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(a)-(c). "Probable cause exists when the affidavit demonstrates in some trustworthy fashion the likelihood that an offense has been or is being committed." United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003).

A court considering a motion to suppress evidence collected by a wiretap on the ground of insufficiency of the wiretap application "examines the face of the affidavit and 'decide[s] if the facts set forth in the application were minimally adequate to support the determination that was made.'" United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003) (quoting United

warrants, were arrested, and the car would have been towed and searched. Opp'n 9 n.4 [Doc. No. 136].

States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989) (alterations in original)); see also United

States v. Taylor, 985 F.2d 3, 5 (1st Cir. 1993) (quoting United States v. Caggiano, 899 F.2d 99,

102 (1st Cir. 1990)) ("[T]he duty of a reviewing court is simply to ensure that the [issuing judge]

had a 'substantial basis for ... conclud[ing]' that probable cause existed."). In determining the

sufficiency of an affidavit, the issuing court must consider whether the "totality of the

circumstances stated in the affidavit demonstrates probable cause" to authorize the government's

application. United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (quoting United States v.

Barnard, 299 F.3d 90, 93 (1st Cir. 2002)). The court reviews the affidavit to make "a practical,

common-sense determination as to whether, given all the circumstances set forth in the

affidavit[] there is a fair probability" that contraband or evidence of a crime will be revealed

through the order authorized by the court. Id. (internal quotation marks omitted) (quoting Illinois

v. Gates, 462 U.S. 213, 238 (1983)).

     *B.*    *Discussion*

     Larios contends that (i) evidence obtained as a result of the initial wiretap application

(and its successors, to the extent they replicated the allegations and omissions) should be

suppressed because the Concannon Affidavit [Doc. No. 114-4] "failed to provide a 'full and

complete' affidavit that truthfully established probable cause to believe that calls concerning the

[T]arget [O]ffenses will be intercepted"; (ii) the material omissions in the Concannon Affidavit

[Doc. No. 114-4] entitle him to a Franks hearing; (iii) evidence obtained from the latter wiretap

applications should be suppressed because they include summary descriptions of conversations

illegally intercepted pursuant to the first wiretap application; (iv) the "[t]he affidavits facially fail

to provide a nexus to Massachusetts to support territorial jurisdiction and the selection of

Massachusetts as a listening post should not provide this nexus"; and (v) "Title III's statutory

suppression provision contains no exception for good faith." Mot. to Suppress 11, 15, 18, 19 [Doc. No. 114]. The court addresses each argument in turn.

       1.      Statements and Alleged Omissions in the January 6, 2020 Concannon Affidavit

Larios primarily contends that Concannon's <u>Affidavit</u> [Doc. No. 114-4] omits material facts with respect to three calls between the Target Telephone and Jauregui's phone that undermine the existence of probable cause. <u>Id.</u> at 12. As to the first call on October 31, 2019, Larios contends that it was Jauregui's phone that contacted the Target Telephone, not the other way around, and that this call could not have conveyed any information concerning the drug shipment because phone records show that the call lasted zero seconds. Mot. to Suppress 1-4 [Doc. No. 114]. Larios further contends this information contradicts Concannon's belief that "[Larios] used the Target Telephone to call [Jauregui] prior to the [October 31, 2019] meeting so [Larios] could obtain information about [Jauregui's] whereabouts so he could in turn inform CW-1 when the fentanyl would be arriving in Massachusetts." Concannon Aff. ¶ 58 [Doc. No. 114-4]. As to the second and third calls on January 2, 2020, Larios argues that Concannon omitted the following details that disprove the Target Telephone's connection to the Target Offenses: the calls were made hours before the delivery, the earlier call did not connect, and the later call lasted two seconds. Mot. to Suppress 13 [Doc. No. 114]. Similarly, Larios contends that this information contradicts Concannon's belief that "[Larios] used the Target Telephone to coordinate [the January 2, 2020] delivery." Concannon Aff. ¶ 58 [Doc. No. 114-4].

While the government acknowledges that on October 31, 2019, Jauregui's phone contacted the Target Telephone (instead of vice versa), it posits that neither that mistake nor the fact that the three calls either did not connect or lasted for only a few seconds negates the

existence of probable cause or Concannon's belief that the Target Telephone was being used in furtherance of the Target Offenses. Opp'n 7 [Doc. No. 131]. The government notes that it remains undisputed that the Target Telephone was "in contact" with Jauregui's phone prior to two known drug deliveries, and thus Concannon had grounds to believe that Larios was using the Target Telephone to communicate with Jauregui about drug deliveries. Id. For further support of probable cause, the government points to (i) the 39 other contacts between the Target Telephone and Jauregui's phone between October 2, 2019, and January 2, 2020, with the most recent voice contact occurring just a few days prior to Concannon's affidavit being signed; (ii) Larios's use of the Target Telephone to rent a vehicle in Connecticut, which he then drove on October 31, 2019, to meet CW-1 to discuss the delivery of 17 kilograms of fentanyl; and (iii) contacts between the Target Telephone and phones subscribed in the name of JDS Transport—Larios's trucking business—where the DTO used trucks to transport drugs. Id. at 7-8.

"In considering a claim that improperly omitted facts . . . undermine probable cause" the court "ask[s] whether, had the omitted information been included, there would still have been a 'minimally adequate' basis" to support the determination that was made. United States v. Burgos-Montes, 786 F.3d 92, 103 (1st Cir. 2015). In this case, the answer is yes. Concannon never states that Larios spoke with Jauregui during the three calls at issue but rather that the Target Telephone had "contact" with Jauregui's phone. As CW-1 had observed Larios with multiple phones used for drug trafficking, it was reasonable for Concannon to believe that a contact from the Target Telephone served as a mode of communication in furtherance of the Target Offenses. Furthermore, other facts in Concannon's affidavit support probable cause to believe that Larios was engaged in drug trafficking offenses and that interception of wire communications over the Target Telephone would result in evidence of those offenses. Namely,

the affidavit details that the Target Telephone called Jauregui, a known drug courier, tens of times during the October 2, 2019 to January 2, 2020 period, that Larios used the Target Telephone to communicate with phone numbers subscribed to JDS Transport and that Larios used the Target Telephone in connection with the rental of the car used to meet CW-1.[18] While Larios may have used the Target Telephone to speak with JDS Transport employees about legitimate business, trucks (and truck drivers) were being used in furtherance of the Target Offenses and probable cause exists that Larios's communications with JDS Transport employees may have been related to drug trafficking.

"To be sure, the bits and pieces of information garnered by the government do not comprise a seamless narrative." United States v. Encarnacion, 26 F.4th 490, 499 (1st Cir. 2022) (finding probable cause exists for a wiretap even though there were "a number of small inconsistencies in the government's proffer"). But as the First Circuit noted in Encarnacion, "seamless narratives are not the stuff of wiretap applications, and to hold that [] relatively small inconsistencies undermine the [] probable cause determination would require [] [] overlook[ing] the forest for the trees." Id.

---

[18] Larios's contention that Concannon's Affidavit [Doc. No. 114-4] improperly omitted that the Target Telephone "was never used to contact CW-1, [Valenzuela], or any other phone number that had contact with CW-1 to arrange the November 3, 2019[] transaction or the January 2, 2020[] transaction," Mot. to Suppress 13-14 [Doc. No. 114], carries little weight where the affidavit notes that Larios used multiple phones other than the Target Telephone to communicate with various individuals, including CW-1, and reasons that that is "why [Larios] has not used the Target Telephone to contact CW-1," Concannon Aff. ¶¶ 43, 44, 44 n.3, 50, 51 [Doc. No. 14-4]. For the same reason, Larios's contention that the affidavit improperly omitted that the Target Telephone did not call Jauregui on November 2, 2019 (the day before the November 3, 2019 drug transaction) is unpersuasive. Mot. to Suppress 13 [Doc. No. 114]. The fact remains that the Target Telephone had numerous contacts with the phone used by Jauregui and the Target Offenses are not limited to the November 3, 2019 and January 2, 2020 drug transactions.

Accordingly, the totality of facts put forth in Concannon's <u>Affidavit</u> [Doc. No. 114-4] in support of the wiretap application for the Target Telephone were more than "minimally adequate" to support probable cause that Larios was involved in the Target Offenses in affiliation with the DTO, that he used the Target Telephone in furtherance of the Target Offenses, and that interception of the Target Telephone would aid the investigation.

2.    <u>Franks</u> Hearing

Larios contends that he is entitled to a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). A defendant seeking a <u>Franks</u> hearing "must make a 'substantial preliminary showing' that the affidavit included a false statement which was made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause." <u>United States v. Nelson-Rodriguez</u>, 319 F.3d 12, 34 (1st Cir. 2003) (citing <u>Franks</u>, 438 U.S. at 155-56); <u>United States v. Adams</u>, 305 F.3d 30, 36 n.1 (1st Cir. 2002). "A material omission in the affidavit may also qualify for a <u>Franks</u> hearing in place of a false direct statement, provided the same requisite showing is made." <u>Nelson-Rodriguez</u>, 319 F.3d at 34 (citing <u>United States v. Scalia</u>, 993 F.2d 984, 987 (1st Cir. 1993)); <u>see also</u> <u>United States v. Charles</u>, 213 F.3d 10, 24 (1st Cir. 2000).

As discussed above, the toll records at issue do not contain a material omission, and thus Larios is not entitled to a <u>Franks</u> evidentiary hearing.

3.    Evidence Obtained from the Four Subsequent Wiretap Orders

Where the court has found that the government provided adequate support for the January 6, 2020 wiretap application, Larios's argument that evidence obtained from the four latter wiretap applications should be suppressed because those applications include summary descriptions of conversations illegally intercepted pursuant to the initial wiretap application fails.

20

4.      Territorial Jurisdiction / "Listening Post" Theory

Under Title 18, United States Code, § 2518(3), a judge may authorize the interception of wire or electronic communications within the "territorial jurisdiction" of the court. "Intercept" is defined as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4).

With respect to the First and Second Orders, Larios contends that territorial jurisdiction as required by 18 U.S.C. § 2518(3) is lacking because the Target Telephone is a California based cellphone used by a California resident with "the vast majority" of the intercepted communications being made while the Target Telephone was not physically present in the District of Massachusetts to phones also not in the district (with the exception of calls initiated by the government through cooperators). Mot. to Suppress 17-18 [Doc. No. 114]. In short, Larios "argue[s] that the 'listening post' theory of jurisdiction, i.e. that an interception occurs either where the phone is located or where the 'listening post' is located, is ill-conceived and urge[s] this Court to depart from nearly 30 years of precedent." United States v. Sidoo, 468 F. Supp. 3d 451, 455 (D. Mass. 2020).

Although the First Circuit has not yet spoken on the issue, the government points out that every appellate court to consider the issue has concluded that the interception occurs either where the phone is located or where the "listening post" is located. Opp'n 11 [Doc. No. 131] (citing United States v. Rodriguez, 968 F.2d 130, 136-37 (2d Cir. 1992); United States v. Cano-Flores, 796 F.3d 83, 87 (D.C. Cir. 2015); United States v. Henley, 766 F.3d 893, 911-12 (8th Cir. 2014); United States v. Luong, 471 F.3d 1107, 1109-10 (9th Cir. 2006); United States v. Jackson, 207 F.3d 910, 914-15 (7th Cir. 2000), vacated on other grounds, 531 U.S. 953 (2000); United

States v. Denman, 100 F.3d 399, 402-03 (5th Cir. 1996); United States v. Jackson, 849 F.3d 540, 552 (3d Cir. 2017) (interceptions occurred at location of "listening post" under Pennsylvania statute modeled after Title III); United States v. Tavarez, 40 F.3d 1136, 1138 (10th Cir. 1994) (same, Oklahoma statute)). Further, while not the central issue in Dahda v. United States, the Supreme Court noted in that case that "a listening post within the court's territorial jurisdiction could lawfully intercept communications made to or from telephones located within [the listening post state] or outside [the listening post state]." Dahda v. United States, 138 S. Ct. 1491, 1499 (2018).

In the present case, the interceptions pursuant to the First and Second Orders were made in Massachusetts where the listening post was based. Accordingly, the court finds that the court issuing the First and Second Orders had statutory authority to do so as required by 18 U.S.C. § 2518(3).[19]

5.     Good Faith Exception

The court need not determine whether the "good-faith" exception under United States v. Leon, 468 U.S. 897 (1984), applies to Title III applications where the court has found the first Title III application provides sufficient probable cause and the First and Second Orders meet the territorial jurisdiction requirement under 18 U.S.C. § 2518(3).

---

[19] Since the court finds the territorial jurisdiction requirement met because of the Massachusetts listening post, the court need not reach Larios's second argument that the two calls placed by the Target Telephone while in Massachusetts to Jauregui cannot trigger wholesale interception of communications.

**IV.     Conclusion**

For the forgoing reasons, Larios's <u>Motion to Suppress Title III Interceptions</u> [Doc. No.

114] and Valenzuela's <u>Motion to Suppress</u> [Doc. No. 115] are DENIED.

IT IS SO ORDERED.

February 2, 2023                                     /s/ Indira Talwani
                                                         United States District Judge