UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br> )<br>   v.                       )<br> )<br>(1) JOSE LARIOS,                  )<br>(2) RAFAEL TORRES, and            )<br>(5) XINGRONG WU, a/k/a "Danny,"   )<br> )<br>         Defendants               ) | Criminal No. 21-CR-10118-IT |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT
STATEMENTS OF COCONSPIRATORS**

The United States, by its undersigned attorneys, hereby moves this Court to allow statements made by defendants Jose LARIOS, Rafael TORRES, and Xingrong WU, and their coconspirators in evidence at trial. The government plans to offer this evidence through in-person recordings, recorded phone calls, text messages, and the testimony of witnesses with personal knowledge of those statements. LARIOS and TORRES worked together to distribute fentanyl and cocaine to a cooperating witness and collect the proceeds of that drug trafficking from that cooperating witness. LARIOS and WU worked together to arrange for the transfer and laundering of those drug proceeds. Additionally, these defendants worked with charged co-defendants Jose Vega Aponte and Marco Antonio Jauregui to distribute and re-distribute the fentanyl they sold. Finally, there was another individual, Alejandro LNU (last name unknown), never fully identified by law enforcement, who supplied LARIOS and his organization with the fentanyl these defendants sold. Given that these defendants and their coconspirators worked together in furtherance of the drug and/or money laundering conspiracies, the Court should admit each of their

statements in evidence as coconspirators' statements under Federal Rule of Evidence 801(d)(2)(E).[1]

## FACTUAL BACKGROUND[2]

In October 2019, a cooperating witness for the government (the "CW") made contact with Alejandro LNU, based in Mexico, and LARIOS. LARIOS and Alejandro discussed the sale of multiple kilograms of fentanyl with the CW. The CW arranged to meet with LARIOS in Boston on October 31, 2019. On that date, LARIOS and another unindicted coconspirator met with the CW and continued to discuss the eventual shipment of drugs. This meeting was audio/video recorded and all calls between the CW and LARIOS were recorded. On November 2, 2019, LARIOS, the other man, and the CW met again to finalize the details of the fentanyl transaction. LARIOS provided a phone number for another coconspirator and charged defendant, Marco Jauregui, and stated that the pickup would take place the following day, November 3, 2019.

On November 3, 2019, the CW, under the surveillance of investigators, met with Jauregui in a parking lot in Assonet, Massachusetts and picked up the drugs. After testing in the DEA laboratory, the lab confirmed the drugs were fentanyl and weighed 17 kilograms. Now, the CW was required to pay LARIOS and Alejandro for that fentanyl.

Alejandro provided the phone number and the serial number for a dollar bill, a common form of receipt among money launderers, to the CW. The phone number was for WU, the man designated to pick up the payment for the fentanyl. On November 4, 2019, after arranging the meeting with WU, an undercover officer (the "UC") met with WU and provided him with a duffle bag full of sham money. After showing the UC the same dollar bill serial number that the CW had

---

[1] Additionally, the statements of the individual trial defendants themselves should be admitted against the defendants who made them as opposing party statements under Federal Rule of Evidence 801(d)(2)(A).
[2] The government will provide a more detailed statement of facts in its trial brief.

received from Alejandro, WU took the duffle bag. DEA Agents quickly arrested WU and he agreed to be questioned. WU confirmed that he had made many other money pickups similar to this one. After being released, WU immediately threw away the phone he had used to coordinate this money pickup.

After this fentanyl transaction and money drop-off, investigators obtained a cell phone location or "ping" warrant for a phone used by co-defendant Jauregui. On January 2, 2020, they observed that the location activity of the phone was suggestive of a drug deal taking place. Investigators surveilled Jauregui meet with charged co-defendant Vega Aponte and conduct a transaction. Investigators stopped Vega Aponte's vehicle and seized 23 kilograms of cocaine from him.

LARIOS continued to reach out to the CW to demand payment for the fentanyl. Investigators intercepted LARIOS calling from California and Mexico to make these demands. Eventually, at investigators' direction, the CW agreed to make a partial payment for the fentanyl. To receive the payment, TORRES flew from California to Boston to meet with the CW. On February 14, 2020, TORRES and the CW met while being surveilled by investigators. The CW provided the partial payment during that meeting.

The calls between LARIOS and the CW continued. Eventually, the CW agreed to meet with LARIOS in Boston for the delivery of an additional six kilograms of fentanyl and another partial payment. LARIOS and TORRES flew to Boston for this meeting. On August 19, 2020, LARIOS and TORRES met with the CW and discussed the next drug shipment and an additional money payment. Later that day, the CW met with Jauregui and received an additional shipment of fentanyl. These drugs also tested positive in the DEA laboratory for the presence of fentanyl and weighed six kilograms.

ARGUMENT

Federal Rule of Evidence 801(d)(2)(E) provides that statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. The First Circuit's "decision in *Petrozziello* explains that such a statement is admissible when the trial judge finds 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'" *United States v. Ruiz*, 999 F.3d 742, 748 (1st Cir. 2021) (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)). "A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, the following four conditions are satisfied by a preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy." *United States v. Diaz*, 670 F.3d 332, 348 (1st Cir. 2012). "[T]he proponent of a statement must introduce some 'extrinsic evidence' of a conspiracy between the defendant and the declarant. In this context, extrinsic evidence means 'other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it.'" *Ruiz*, 999 F.3d at 748 (quoting *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002)).

Because the Court must consider the coconspirators' statements but cannot rely solely on the statements themselves to establish "the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), the government intends to introduce sufficient extrinsic evidence to meet the criteria for admissibility. First, LARIOS's, TORRES's, and WU's statements themselves are admissible under Federal Rule of Evidence 801(d)(2)(A) as statements of opposing parties and

provide sufficient extrinsic evidence to satisfy the requirements for admission of their coconspirators' statements.

Additionally, the observations of these defendants' actions and the actions of their coconspirators from October 2019 through August 2020 all provide sufficient extrinsic evidence of the conspiracy. For example, investigators observed LARIOS and TORRES together at the August 2020 meeting with the CW; TORRES flew from California to Boston in February 2020 to pick up money arranged by LARIOS; Jauregui delivered fentanyl to the CW twice after LARIOS and TORRES set up each transaction; and Alejandro provided the dollar bill serial number to the CW and WU presented that same serial number to the UC when attempting to pick up drug proceeds. These instances all provide sufficient extrinsic evidence of the conspiracy. *See, e.g.*, *United States v. Rodas*, 523 Fed. Appx. 731, 733-34 (1st Cir. 2013) (finding sufficient extrinsic evidence where "[t]he Government presented evidence that [Defendant] was photographed with his co-conspirators…outside the [location] where the [drug] was seized"); *United States v. Mitchell*, 596 F.3d 18, 24 (1st Cir. 2010) (finding "call patterns and conversations among co-conspirators provided strong circumstantial proof" that defendant was a member of the conspiracy); *United States v. Ortiz*, 966 F.2d 707, 713-14 (1st Cir. 1992) (finding "the existence of a close relationship between a defendant and others involved in criminal activity can, as a part of a larger package of proof, assist in supporting an inference of involvement in illicit activity" and that "presence [at a drug deal] patently implied participation."). In addition to the statements themselves, which clearly show the existence of the conspiracy and the coconspirators' places within it, this extrinsic evidence is sufficient for the Court to determine that a conspiracy existed, the charged co-defendants and Alejandro LNU were members of this conspiracy, and to admit the statements of all these coconspirators in evidence at trial.

CONCLUSION

For all the foregoing reasons, the government respectfully requests that the Court admit statements made by all coconspirators in these drug and money laundering organizations as coconspirators' statements under Federal Rule of Evidence 801(d)(2)(E).

                Respectfully submitted,

                JOSHUA S. LEVY
                Acting United States Attorney

      By:  /s/ *Stephen W. Hassink*
                Leah B. Foley
                Stephen W. Hassink
                Assistant United States Attorneys

Date: June 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                */s/ Stephen W. Hassink*
                Stephen W. Hassink
                Assistant United States Attorney

Date: June 20, 2023