UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOSE LARIOS
Defendant

No. 21-cr-10118-IT

**SENTENCING MEMORANDUM ON BEHALF OF JOSE LARIOS**

Born into relative poverty and having to work from the age of 15 to help pay for his and his family's expenses, Mr. Larios worked hard to overcome health problems, the loss of his first cousin to violence, and other significant life challenges. Along the way he was blessed by a full life: he found a lifelong partner/spouse, had three loving children (ages 2 to 18), and has the love and support of his family and friends. As the letters submitted to the Court describe in great detail, Mr. Larios has often displayed extraordinary compassion, generosity, and charitable commitment. Letter after letter detail a caring and supportive partner/spouse, a deeply involved father, an empathetic and dependable friend to many, and a man who routinely and regularly does good deeds, large and small, without an expectation of anything in return.

The issue presented here, as in all sentencing proceedings, is "what" punishment is fair, necessary, and appropriate, given all the relevant facts and circumstances; or, in the words of 18 U.S.C. § 3553(a), what sentence is "sufficient, but not greater than necessary," to serve enumerated sentencing goals. For all the reasons detailed herein, as well as those to be presented

at sentencing, the defense respectfully requests this Honorable Court to impose a sentence of 120 months. While such a sentence is below the advisory guideline range as calculated by Probation, the defense respectfully submits that it constitutes a gravely serious punishment – one that sends a very serious message to both Mr. Larios and the community at large; it properly takes into consideration Mr. Larios's role in the underlying conduct and his post-confinement efforts to move past his mistakes; and it is consistent with the objectives of § 3553(a), and the principle expressed therein that this Honorable Court should impose a sentence sufficient, but not more than necessary, to comply with the purposes of § 3553(a).

## I. RELEVANT BACKGROUND AND CIRCUMSTANCES

### *A. Personal and family background.*

Born in South Central, Los Angeles, a high-poverty neighborhood overrun by gangs and violence, Mr. Larios is currently 43 years old. Initial PSR at ¶ 59. At the time he was born, Mr. Larios's parents were young immigrants who came to this country seeking better opportunities. His father, who was 24 years old when Mr. Larios was born, worked as a traveling musician and then later in the produce business. Letter of Deisy Larios, attached hereto as Exhibit 1; Initial PSR at ¶ 58. His mother, who was 21 years old, worked in a factory. *Id.* The family resided in a small 500 square foot studio apartment that was also, at times, inhabited by relatives from Mexico. *Id.*; Initial PSR at ¶ 58.

At a very young age, Mr. Larios was diagnosed with severe asthma that required frequent hospitalizations. *See* Exhibit 1 ("He was admitted into the hospital for about four hours once every one to two weeks"); *See* Letter of Josefina Pacheco, attached hereto as Exhibit 2 ("Very soon after he was born, I realized that something was not okay with him. He was diagnosed with

severe asthma attacks, I spent so much time in the hospitals, days – weeks turned into months. The doctors provided so much medication for many years and I saw how the medications affected him"); Letter of Jose Larios Sr., attached hereto as Exhibit 3. As a result, Mr. Larios's childhood was severely restricted. He was confined to the family's studio apartment; not allowed to play outside or participate in any physical activities with his cousins. Exhibit 1. Even when his asthma subsided when he was 5 years old, Mr. Larios continued to be limited in his activities – "he remained restricted from eating or drinking anything that was cold, running, playing sports, pets, pollen, and remained indoors throughout the winter and spring seasons." Exhibit 1.

Still as Mr. Larios grew older and overcame his earlier health challenges, the prospect of an ordinary childhood was nonexistent. In her letter, Deisy, Mr. Larios' sister recalls that South Central was marred by constant gang-related violence during their childhood:

> Living anywhere remotely to where gangs resided resulted in affiliation by the location of your address. Therefore, to protect themselves, Jose and his cousins often ran home to avoid being physically assaulted. Jose eventually experienced physical assaults by other boys in the area due to on-going gang affiliated violence. Going to school was dangerous, gangs, drugs, and violence on the streets of historical South-Central Los Angeles. Jose never involved himself with gangs, as his parents made sure of it by limiting any participation in extracurricular activities that would prevent him from immediately returning home after school. Jose's mother and father made certain that Jose only spent time with his cousins, limiting friendships outside of the family, ensured he always dressed properly, and forbid him to have a buzz cut hair.

Exhibit 1; Initial PSR at ¶ 59 ("The defendant advised living in the South Central, Los Angeles neighborhood was tough due to the prevalence of drugs, crime, and violence. He recounted several infamous drug lords who lived and operated drug dens in the same neighborhood. He recalled several instances when gangs would terrorize residents or engage in violent gang or law enforcement shootouts and activities that resulted in murders and destruction of property.").

Despite precautions that Mr. Larios' family took to keep the children safe, Mr. Larios suffered a tragic loss when he was just 12 years old:

> [A] close first cousin (15 y/o) of Jose, whom he shared a childhood upbringing with was murdered by gang affiliated members. Our cousin was wounded by gunfire a few houses from his home. Our cousin ran as far as he could back home but died at his doorsteps in the arms of his father. The violent murder was detrimental to Jose Jr. and the entire family. This was Jose's first experience of death and loss, at age 12. Although the family knew the neighborhood was not safe, they did not fully comprehend the severity of the dangers on their local streets until this tragic event. For the next few months, Jose Jr. and the entire family suffered harshly. After the passing of our cousin, our parents made certain that he, once again, had transportation to and from school. Jose had no choice but to remain indoors for his safety; much like his experience of remaining indoors during his early childhood years. Though, this time it was by the choice of Jose to isolate himself, as he was aware of what happened to his late cousin. Jose had learned that the world was not safe.

Exhibit 1. Seeking to remove Mr. Larios and his young sister from the violent streets of South Central, the family relocated to South Gate, California. However, shortly after the move Mr. Larios' parents divorced. To support the family, Mr. Larios' mother obtained a second job in addition to her full-time job at the factory. Exhibit 1. To help the family, Mr. Larios babysat his younger sister and obtained employment to help cover the family's expenses:

> As a single parent, the moment Jose could physically work he did. He helped me with whatever he could. He often went to work with his father and his uncles. During school breaks he went up north to my sister's house. My sister lived in an orchard where they picked apples, peaches, raspberries, and many more different fruits. He worked in their fields and picked fruit all summer and at the end of the school break he would return home. He saved most of the money and would help with the bills around the house. I was always very grateful for that. Jose was aware of how difficult it was for me to provide the basic needs like clothes, food, school supplies etc. But we worked together. I never asked him to work but he made that decision for himself, he is selfless.

Exhibit 2; Exhibit 1; Letter of Julianne Lucia, attached hereto as Exhibit 20 ("One thing that I clearly recall from the sharing of my wife is that Jose was more of a father to her, as she was 6

years old when their parents divorced, and Jose was 14 years old. Over the years, my wife shared with me many stories about her brother, including that Jose gained employment during his adolescence, so he could financially help his mother and sister. Jose was the person who bought his sister her first bike. He was also the person his sister would contact when she was scared at home alone while their mother was busy working"); Initial PSR at ¶ 59.

While Mr. Larios excelled academically, his school experience was similarly difficult because severe bullying undercut his educational efforts. Exhibit 1. "The experience of being abused was horrifying for Jose Jr., so he kept himself at home for several months." Exhibit 1. "He lost a significant amount of weight. He was distraught, as he spent nights awake crying. Jose has never openly spoken about his traumatic experience. This led to Jose to skip class and get expelled from school." Exhibit 1. Despite these difficulties, Mr. Larios' parents enrolled him in a different school from which he graduated and obtained a high school diploma. Exhibit 1. Subsequently, Mr. Larios enrolled in college. Initial PSR at ¶ 83. However, rather than continue to pursue an education, Mr. Larios went to work to continue to provide for his family. *See* Letter of Ricardo Larios, attached hereto as Exhibit 4 ("due to family responsibility's Jose decided to pause school and return to work to his father's Produce Business. But that's how Jose has always been, putting his family first, that's what a caring person will do to provide for his family."); Exhibit 1 ("Unfortunately, because Jose did not have the opportunity to continue with his college education in effort to help his mother with the financial burden; therefore, he emphasized the importance of education upon his children and provided support by being active and present for them.").

After attending college, Mr. Larios worked for an eyeglass manufacturer, a Toyota

manufacturing company, and in construction for Wadsworth Golf Construction. Exhibit 1. In approximately 2010, Mr. Larios bought a tow truck and started working as a subcontractor for Cherokee Recovery recovering repossessed vehicles. Exhibit 1. After someone threatened Mr. Larios with a weapon and business slowed down, Mr. Larios resumed working with his father. Exhibit 1. In approximately 2013, Mr. Larios worked as a truck driver for Haute Look, a Nordstrom division, driving interstate between California and Nevada. Exhibit 1. Subsequently, Mr. Larios bought a 23-foot bobtail truck and started a small trucking company, JD's Transport, LLC. In approximately 2018, Mr. Larios' trucking company started failing – business dried up and his tax accountant misappropriated the funds that were meant to be paid to the tax collector. Initial PSR at ¶ 80; Exhibit 1 ("Between the timeframe of 2017 to 2018, Jose realized that his tax agent made several filing mistakes and ultimately, he realized that he owed thousands of dollars in taxes, of which he still owes to date, that led to overwhelming credit card debt. Around the same time, business in general began to slow down and one of his employees had an accident while driving and began to threaten to sue Jose for medical costs."). Financially struggling and in debt, Mr. Larios turned to alcohol and drugs as a coping mechanism, developing a serious addiction that clouded his judgment:

> There was times when Jose would have whiskey bottles right next to the bed, nose bleed toilet paper along with a trash can that Jose will used to vomit. I would toss the whiskey away in our kitchens sink when Jose would fall asleep. It was becoming an everyday struggle that was causing our relationship problems. During COVID pandemic, alongside with the lock down I had hope that time spent at home would help him stop the drinking and substance abused, but it only made it worse, Jose manage to leave home to work and retuned in the middle of the night or next day in the morning. Jose always refused to get help, he said he had controlled, not realizing that the alcohol and drug abused was consuming him.

Letter of Leticia Velasquez, attached hereto as Exhibit 5; *See also* Exhibit 1; Initial PSR at ¶¶ 76-

82.

Importantly, family is everything to Mr. Larios. *See e.g.,* Letter of Jasmine Rodriguez, attached hereto as Exhibit 11 ("His dedication to our family is not just a statements; it's a way of life"). Since 2003, Mr. Larios has been together with his partner, Leticia. Exhibit 5. The couple has two sons and a daughter that was born after Mr. Larios' arrest that he has never met. Exhibit 5. At the time of Mr. Larios' arrest, the family lived in a modest 2-bedroom rented home juggling work, children, and credit card debt. Mr. Larios is deeply committed to his kids and his partner. Since the day his kids were born, Mr. Larios has attended all their medical appointments and been there for every school event, extracurricular activity, and every tournament:

> Jose and I have two young boys and a daughter who are healthy and happy. Jose always makes our family his first priority. He does not miss any of our boy's sport practice, school meetings or doctor's appointments. Jose is a great father who has played a major role in his kid's life. [IL] & [JL] have developed great communication with their dad (Jose) and have always looked up to him. Even without their father being home with them they still cherish every second they get to talk. Jose has always been there for our kid's. For example, if both [JL] and [IL] had a bad day he'd take time to comfort and made sure they knew everything was going to be okay.

Exhibit 5. Mr. Larios' caretaking and support have been instrumental in his children's upbringing. His eldest son was recently accepted to UCSD with a full academic scholarship and his younger son, who is still in school, has similarly excelled academically:

> The "proof Is in the pudding", his sons have an outstanding academic record. Jose's eldest son, from an early age, has been a bright and curious boy. His eldest often challenged Jose with questions, and at times, Jose had no answers for him because of how knowledgeable he was. His eldest was valedictorian when he cumulated from middle school. His eldest attended Paramount High School. His eldest has a superb track record in track and field running, was captain for track and field and cross country, was league champion senior year, won most valuable runner senior year, was a part of the California Scholarship Federation (CSF) club, was nominated for prom king, maintained above 4.0 GPA throughout high school and graduated with

> honors with a 4.3 GPA. To current date, his eldest was accepted to the University of California in San Deigo with a major in Neuroscience. He moved into the dorms on September 22, 2023; it is the beginning of living a life that Jose has always dreamed of for his children. Although Jose was detained, has continued to influence his kids to move forward and accomplish their dreams. His middle child, although only 14 years old, is also on a bright path. He is currently a part of the California Junior Scholarship Federation, is in an accelerated math program, and attends accelerated math courses during summer breaks. He created a new strategy for math and his strategy is now being used to be taught to other students throughout his school. He is on the path to being nominated for valedictorian like his bother by the time he finishes middle school.

Exhibit 1. Mr. Larios' absence has been devastating for his older children and his partner Leticia, who moved in with her mother following Mr. Larios's arrest:

> As for myself I am still trying to cope with this life situation being left as the only provider for the family, caregiver and having to work a full time job, it's been very hard. My mom had to move in to help me take care of my daughter [CM], while I work .I was left with major credit card debts, rent, bills, and etc. I haven't had the time to sit and think of myself and how this situation has affected me personally, having to deal with the above responsibilities keeps me busy that I only have time to think of my kids and if tomorrow my kids will have food in the table. After Jose arrest months after my daughter was born, a week after I was hospitalized for heavy bleeding went through surgery and release a week after. Doctors couldn't determine the cause. But I was afraid of losing my life and leaving my kids alone. Thankfully god heard my prayers and I'm still here.

Exhibit 5.

Mr. Larios good deeds are not limited to only helping his family; he is also a caring individual that goes out of his way to help others, even strangers. Exhibit 5 ("I remember one time in which it was really cold and we saw a homeless person outside a church sleeping with no blanket, so Jose asked my youngest son what can we do to help this man, my son replies, dad I have a blanket can I give it to him, so he won't be cold anymore, Jose told my son yes, you have a home to go to and a bed to sleep, this man doesn't so please help him and god with bless you always."). During her time of need Mr. Larios visited his aunt nearly every afternoon "to help her eat, change

her clothes, and help her with physical exercises" following her paralysis from a brain tumor. *See* July 5, 2021, Letter of Deisy Larios, attached hereto as Exhibit 6. Mr. Larios also purchased and hand delivered school supplies to underprivileged children in Mexico. Exhibit 6 ("On another occasion one year, we both saved all of our spare change the entire year and purchased back to school supplies from various stores around our neighborhood during the clearance sales. We planned to take the school supplies to nearby small town in my mother's homeland in Mexico. That year we did not pack many clothes, instead we packed as many notebook, pencils and colors for the children in the town. The night we dispersed the school supplies to the children, we could not help but to feel a rush of emotions."). In their letters, friends and family members recount countless stories of Jose's generosity and support. See Letter of Angel Velasquez, attached hereto as Exhibit 7 ("One particular memory experience with Jose was a summer he took us to Knotts Berry Farm. I had never been there, and I mentioned it to my mom and Jose overheard so he took it upon his hands to make it happen. It was an amazing experience."); Letter of Cristina Jimenez, attached hereto as Exhibit 8 ("On my husband's and I's wedding day, I did not have a ride to the chapel. Jose went out of his way to pick me up along with Leticia to take me. It is little things like those that make Jose a special person. He does things without expecting anything in return."); Letter of David Larios, attached hereto as Exhibit 9 ("Jose has always been a caring person. He never wants anyone to feel left out. He goes out of his way for his loved ones, even strangers. On many occasions, I witnessed him helping the homeless by buying them food."); Letter of Denisse Acosta, attached hereto as Exhibit 10 ("Three years ago, we had a particularly memorable experience with Jose. He reached out to my husband and me, that he wanted us to travel to California to spend Easter with his family. Despite the distance, he was ready to welcome us into

his home, as he was full of love and very warm. We attended a pirate show and had an amazing time. My kids enjoyed the show but overall were thrilled to be with their Tio Nino."); Letter of Roxana Garcia, attached hereto as Exhibit 12 ("He once helped my sister when she needed someone to believe in her and she lived with him to finish high school and she graduated. He would give her rides to school and pick her up. He's the best dad to his kids."); Letter of Virginia Garcia, attached hereto as Exhibit 13; Letter of Yvonne Larios, attached hereto as Exhibit 14.

*B. Post-offense rehabilitation efforts.*

Certainly, Mr. Larios acknowledges that he has made mistakes in his life. He finds himself convicted of a very serious drug offense that he fully takes responsibility for and understands that this is his chance to change his life:

> I am aware that the crimes I committed cannot be undone. I acknowledge that my involvement with drugs have hurt people and the community on many different levels. I understand that I have also hurt my family. During my time of incarceration, I have had ample opportunity to reflect on my life and reevaluate my perspectives and beliefs. I am grateful for the time and attention you are giving me to express my remorse. I was brought up by a law-abiding family that taught me strong moral principles. I find fulfillment in hard work. I understand that shortcuts often lead to regret. With that being said, I am filled with regret regarding my current offense. While addiction, trauma, lack of education, or other factors may have contributed to my current situation, I choose not to use them as excuses. The reality is that my actions stem from my opportunistic nature and misuse of my skills and abilities. Your Honor, I acknowledge that there is no justification for violating my core values for personal gain, especially at the expense of others.
>
> For these reasons, I would like to extend a heartfelt apology to the courts, the community, the victims and the families who were impacted by my actions. While this may be a routine part of your job, I find myself in an unprecedented situation, not only due to the consequences I face, but also because this experience is so unlike my true character.

Letter of Jose Larios, attached hereto as Exhibit 21. Not idly sitting by, Mr. Larios has been

working hard on improving himself and making amends for his past mistakes.

Following his pretrial incarceration on May 19, 2021, Mr. Larios has shown genuine remorse for the harm caused, both to the individuals directly involved and the community at large. This sincere regret is reflected in his active participation in programming at the Wyatt Detention Center. He has actively worked on addressing any underlying issues that contributed to his behavior. He has demonstrated a commitment to self-improvement in all respects. In the last two years, Mr. Larios completed nearly every class, program, and book club offered by the Wyatt Detention Center (approximately 100 in total) and is continuing to enroll in any programs that are offered. See Exhibit 15 (Certifications and Transcripts from Wyatt Detention Center). According to staff at Wyatt, Mr. Larios "maintains a positive attitude and is respectful towards both staff and his peers" and as of September 2022, Mr. Larios successfully participates in the "worker program," where he "has demonstrated a strong work ethic…. shows initiative and has received excellent work evaluations." Exhibit 16.

Additionally, after multiple applications, Mr. Larios was accepted to, participated in, and completed every portion available to him of the Restorative Justice Program run by U.S. Probation Officer Maria D'Addieco, AUSA Jamie Herbert and Acting U.S. Attorney Josh Levy. *See* Email from AUSA Herbert, attached hereto as Exhibit 17. Mr. Larios has made a serious commitment to the program and has even helped start a self-help group at Wyatt called Building on Self-Substance:

> First, I am very thankful for this program and all those who participated in it. I was able to meet some great people that I never would have imagined befriending. These included facilitators from the offices of the US Attorney, US probation, Federal Defenders, and also Victim's Advocate group. Together, we were able to forge friendships founded in deep respect for one another, as well as trust and

> vulnerability. We were able to prove that there are healthier alternatives to the current system that work- and this is in the form of "restorative justice".

Letter of Jose Larios, attached hereto as Exhibit 18. He has similarly rediscovered his faith:

> Jose speaks with his family on a regular basis. His family is his life. He is always in Prayer, and Prays the Rosary daily with several others, reads the Bible and other Religious books, reviews spiritual movies, and/or on his knees in personal Prayer. I observe his assisting other inmates who have issues and problems. He is the first to share his personals with others. Above all, he is truly sorry for his past. As time progressed, Jose's knowledge and understanding of his past wrongs surfaced and he is most remorseful. Jose now better understands man's laws, rules, regulations to run a parallel with God's Commandments.

Letter of Chaplain Leo G. Mogavero, attached hereto as Exhibit 19.

In short, Mr. Larios accepts full responsibility for his actions and the attendant consequences. He understands that as a 43-year-old, this is his chance to become a productive member of society and to be the role model for his children that he always aspired to be. As discussed *supra*, Mr. Larios is actively working to create a better future. Importantly, he is not doing this alone – he has the unconditional love and support of his friends and family.

*C. Offense Conduct*

While Mr. Larios does not, in any respect, seek to depreciate or minimize the gravity of his offenses, he does seek to place his conduct in the proper context, including the fact that he was not the party responsible for arranging the sale of the narcotics. Well before Mr. Larios traveled to Massachusetts, CW-1 was in communication with other members of the DTO, who negotiated the quantity, the price, and the type of narcotics that were supposed to be delivered. *See* Dkt. 154 at 2 ("The first call was from an unknown Mexican male who discussed establishing a drug trafficking relationship with CW-1 and inquired about which drugs CW-1

was interested in purchasing. CW-1 said that he was interested in purchasing fentanyl … CW-1 exchanged a series of recorded calls and text messages with a Mexico-based cellular phone number during which a male who identified himself as Alejandro continued to discuss the logistics of the drug transaction with CW-1…") (internal citation omitted). Based on those same calls, the initial delivery was supposed to take place in New York and conducted by someone other than Mr. Larios, who has never been to New York during the relevant period. Once the location was changed to Massachusetts, Mr. Larios was sent to meet CW-1 – at a time when the price, quantity, and type of drug was arranged with other members of the DTO. Mr. Larios then traveled to Massachusetts in his own name to discuss the sale with CW-1. The fact that he traveled in his own name throughout the duration of the trip – including renting a vehicle in his own name and using his own phone number – belies a high-level sophisticated trafficker. Indeed, it would make little sense for someone important to fly out and meet a buyer, who neither he nor any other person involved in the alleged conspiracy has ever met before to discuss a major drug purchase. Mr. Larios was sent to a place where he had never been before, to meet an individual he knew nothing about and placed in jeopardy because he was disposable rather than an important figure within this DTO. Similarly, the August 2020 transaction was negotiated with CW-1 by a man named Alejandro, *see* Exhibit 1 to Initial PSR Objections (Alejandro and CW negotiating a transaction for 6 kilos, the payment of the driver, and the pickup of funds in January 2020), and the monetary pickup in February 2020, was likewise arranged for by an individual named Alejandro, *see* Exhibit 3 to Initial PSR Objections. All the drug proceeds, other than the $3000 that Mr. Larios received for his involvement during the August 2020 transaction, based upon information and belief, went to Alejandro. Indeed, at the time of his arrest, Mr.

Larios lived in a modest 2-bedroom, 1-bathroom home that the family rented and no drugs or cash were seized from Mr. Larios' home or business.

## II. ARGUMENT

Supreme Court and First Circuit precedents confer broad discretion on this Court to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007). "[O]nce the guidelines sentencing range [GSR] is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the guidelines sentencing range based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008) (citation omitted).

What punishment should properly be imposed upon an individual ultimately rests upon a complicated analysis of the individual involved: what punishment has already been inflicted, are they likely to engage in recidivist behavior, have they been rehabilitated or are they particularly receptive to rehabilitation, and whether incarceration will significantly further the goals of sentencing. It is a complex matrix of factors, ultimately dependent upon the individual human being at issue, which is precisely why our criminal justice system has vested this Court with discretion to differentiate and individualize sentencing.

The issue here becomes what is the most appropriate sentence in this case, given Mr. Larios's conduct and the facts and circumstances of his life. The defense respectfully submits a sentence of 120 months confinement is fair, just and more than sufficient to meet the sentencing objectives of section 3553(a). First, confinement of ten years is a gravely serious sentence that reflects the serious nature of the conduct at issue. It is sufficient, but not greater than necessary,

to not only send a powerful message to Mr. Larios for the need to change, but to all others that they will receive a significant jail sentence if they commit similar conduct, thereby serving as general and specific deterrence. Second, the sentence accurately considers Mr. Larios's underlying conduct and his personal determination and post-offence and post-confinement rehabilitative efforts, which include accepting his guilt and committing himself to a cause of personal responsibility and change. Finally, the requested sentence is consistent with sentences imposed on similarly situated defendants in this district and throughout the country.

Importantly, no jail sentence is "short" to the human being who must spend his time confined to a correctional facility, separated from friends and loved ones. Particularly someone like Mr. Larios who is a dedicated partner/husband and a loving father to three children that he has spent years guiding. He was a consistently caring, helpful, and dependable partner and friend. The conduct at issue in this case should not outweigh the lifetime of good deeds, hard work, kindness, and overall decency and humanity that Mr. Larios displayed time and time again. A 120-month sentence would certainly be "significant . . . to an offender," like Mr. Larios, "who has never been incarcerated [before]." *United States v. Herink*, 2012 WL 3112002, at *8 (D. Neb. July 30, 2012). Indeed, Mr. Larios has never been incarcerated and had no interaction with law enforcement for nearly fifteen years prior to this case. His past criminal charges were minor, and most were dismissed.

Moreover, Mr. Larios has not only accepted responsibility for his actions, but put all his efforts during his confinement into attempting to remediate and change his behavior – he has completed the drug addiction programming that was available to him; he completed nearly every other program that was offered to him at his detention center; and most importantly he went

through the restorative justice program that has been so powerful and helpful that he started a self-help group applying the principles that he learned.

The defense respectfully submits that a sentence of imprisonment of 120 months is fair, just, proportionate, and sufficient to meet the § 3553(a) sentencing objectives – particularly where Mr. Larios, because of his conduct, would not be eligible to reduce his term of incarceration through First Step Act programming. 18 U.S.C. § 3632(d)(4)(D). In essence, Mr. Larios will serve nearly all the time that this Honorable Court imposes. By the time that Mr. Larios is eligible for release, his oldest son will have finished college, his youngest son will likely be attending college, and the daughter that he has yet to meet will be in school. Painfully, Mr. Larios will not be able to witness many of his children's milestones or be able to assist his partner Leticia during these challenging times. Knowing the important milestones that he will miss in his children's lives is a powerful motivator ensuring that Mr. Larios continues down the correct path. *See United States. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend). Mr. Larios' family has already endured because of Mr. Larios' prolonged absence, a longer sentence is simply unnecessary to specifically deter Mr. Larios or any other prospective criminal. *See e.g.,* Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

Finally, 120 months confinement would be consistent with, rather than disparate from

sentences imposed on similarly situated defendants across the country according to probation's research, *see* Initial PSR at ¶ 110 ("For all 38 defendants in the cell, the average sentence imposed was 140 month(s) and the median sentence imposed was 120 month(s)."). Indeed, the requested sentence is consistent with and more significant than sentences imposed on certain defendants in the District of Massachusetts and elsewhere who engaged in similar or more egregious conduct:

| **CASE** | **SENTENCE** | **SUMMARY** |
|---|---|---|
| *United States v. Baez*, 16-cr-101110-IT (D. Mass) | 121 months incarceration | Defendant pled guilty to conspiring to distribute kilograms of fentanyl and heroin and conspiring to commit money laundering. By the government's estimates the was accountable for the distribution of the equivalent of at least 10,000 but less than 30,000 kilograms of marijuana. Dkt. 136 at 6. |
| *United States v. Fajardo*, 22-cr-10149-NMG (D. Mass) | 96 months incarceration | Defendant was arrested with approximately 50,000 counterfeit oxycodone pills containing 7.3 kilograms of fentanyl. Additionally, law enforcement seized an industrial pill press in his apartment and molds for pharmaceutical-grade Oxycodone pills, approximately 1.4 kilograms of fentanyl powder, 4 kilograms of mixing agent, and 50 rounds of .40 caliber ammunition. |
| *United States v. Johnson*, 22-cr-10103-LTS (D. Mass) | 90 months incarceration | Defendant was part of a large, violent DTO that trafficked 30 kilograms of fentanyl per year through 500,000 pills. Defendant worked directly with the head of the DTO. Defendant possessed and used a variety of firearms (including an AR-15; a fully automatic Glock 17; multiple large caliber revolvers; and a number of pistols equipped with large-capacity magazines) to threaten rival drug dealers and cultivate the DTO's violent |

| | | |
|---|---|---|
| | | reputation in furtherance of its DTO activities. Defendant was involved in multiple violent offenses committed on behalf of the DTO, including an attempted armed robbery. |
| *United States v. Valentine*, No. 21-cr-00112 (D. Conn.) | 72 months incarceration | Defendant Valentine ran a major DTO in Connecticut. The defendant trafficked 25+ kilograms of fentanyl and 6+ kilograms of cocaine in approximately a year. *See* Dkt. 5 During a search of defendants' properties, law enforcement located $700,000 in drug proceeds, kilograms of fentanyl, heroin, and cocaine, items used to process and package narcotics, and multiple firearms. Dkt. 5 at 9. Defendant pled guilty to a lesser included offense carrying a 5-year mandatory minimum. |
| *United States v. Mateo-Silva*, No. 21-cr-00112 (D. Conn.) | 70 months incarceration | Defendant Mateo-Silva was a member of the Valentine DTO, from whom investigators seized $100,000. Defendant pled guilty to trafficking at least 3.5+ kilograms of cocaine. *See* Dkt. 125. |
| *United States v. Tejeda-Lara*, 22-cr-10280-LTS (D. Mass) | 54 months incarceration | Defendant pled guilty to possession with intent to distribute multiple narcotics. During a search of Defendant's home, law enforcement recovered 5 kilograms of fentanyl, 327 grams of heroin, and 46 grams of cocaine. |

Mr. Larios understands the seriousness of his conduct and the charges against him; however, he is also a clear example of someone who has the capacity and desire for redemption and transformation. Mr. Larios deeply regrets his actions and has demonstrated sincere remorse. The requested sentence is not only consistent with sentences for similarly situated defendants but would also provide him with the opportunity for rehabilitation and the ability to become a productive and law-abiding member of society.

## III. CONCLUSION

For all the foregoing reasons, as well as additional grounds and reasons to be submitted to the Court on or before the date of sentencing, the defense respectfully submits that a sentence of 120 months confinement is a fair and just sentence, and no more than necessary given all pertinent facts and circumstances. Furthermore, Mr. Larios respectfully requests this Honorable Court to recommend that he be allowed to participate in the RDAP program and to judicially recommend that he be allowed to serve his period of confinement at a BOP location, commensurate with his security level, in Southern California.

Respectfully Submitted,
Jose Larios,
By his attorney,

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: October 24, 2023

**CERTIFICATE OF SERVICE**

I, Maksim Nemtsev, hereby certify that on this date, October 24, 2023, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.